# 23-410-cv(L)

**23-418-cv(CON), 23-420-cv(CON), 23-423-cv(CON)**

## United States Court of Appeals
## for the Second Circuit

IN RE BYSTOLIC ANTITRUST LITIGATION,

(*caption continues on inside cover*)

On Appeal from the United States District Court
for the Southern District of New York
No. 1:20-cv-05735 (Hon. Lewis Liman)

**BRIEF OF THE ASSOCIATION FOR ACCESSIBLE MEDICINES
AS *AMICUS CURIAE* IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE**

Dated: July 24, 2023

Michael E. Joffre
Kristina Caggiano Kelly
Richard A. Crudo
STERNE KESSLER GOLDSTEIN &
 FOX PLLC
1100 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-2600

*Counsel for* Amicus Curiae*, The
Association for Accessible Medicines*

CVS PHARMACY, INC., RITE AID CORPORATION, RITE AID HDQTRS. CORP., J M SMITH CORPORATION, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED, D/B/A SMITH DRUG COMPANY, KPH HEALTHCARE SERVICES, INC., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, A/K/A KINNEY DRUGS, INC., MAYOR AND CITY COUNCIL OF BALTIMORE, UFCW LOCAL 1500 WELFARE FUND, TEAMSTERS WESTERN REGION & LOCAL 177 HEALTH CARE PLAN, FRATERNAL ORDER OF POLICE MIAMI LODGE 20, INSURANCE TRUST FUND, LAW ENFORCEMENT HEALTH BENEFITS, INC., TEAMSTERS LOCAL NO. 1150 PRESCRIPTION DRUG BENEFIT PLAN, TEAMSTERS LOCAL 237 WELFARE FUND AND TEAMSTERS LOCAL 237 RETIREES BENEFIT FUND, ALBERTSONS COMPANIES, INC., H-E-B L.P., THE KROGER CO., AND WALGREEN CO.,

*Plaintiffs-Appellants*,

*v.*

FOREST LABORATORIES, INC., FOREST LABORATORIES IRELAND, LTD, FOREST LABORATORIES HOLDINGS LTD., FOREST LABORATORIES, LLC, ALLERGAN SALES LLC, ALLERGAN, INC., ALLERGAN USA, INC., ABBVIE, INC., WATSON PHARMA, INC., WATSON LABORATORIES, INC. (NY), WATSON LABORATORIES, INC. (CT), WATSON PHARMACEUTICALS INC., ACTAVIS, INC., TEVA PHARMACEUTICALS USA, INC., TORRENT PHARMACEUTICALS LTD., TORRENT PHARMA INC., AMERIGEN PHARMACEUTICALS LTD., AMERIGEN PHARMACEUTICALS INC., GLENMARK GENERICS, INC., USA, GLENMARK GENERICS LTD., GLENMARK PHARMACEUTICALS S.A., HETERO LABS LTD, HETERO DRUGS LTD., HETERO USA INC., INDCHEMIE HEALTH SPECIALTIES PRIVATE LTD., ALKEM LABORATORIES LTD., ASCEND LABORATORIES, LLC, ANI PHARMACEUTICALS, INC., WATSON LABORATORIES, INC. (NV), WATSON LABORATORIES, INC. (DE), TEVA PHARMACEUTICAL INDUSTRIES LTD., AND GLENMARK PHARMACEUTICALS LTD.,

*Defendants-Appellees*.

# DISCLOSURE STATEMENT

The Association for Accessible Medicines (AAM) is a 501(c) nonprofit organization. It has no parent company and issues no stock, and no publicly held corporation owns a 10% or greater interest in AAM.

# TABLE OF CONTENTS

STATEMENT OF INTEREST ...................................................................1

INTRODUCTION ................................................................................3

ARGUMENT ......................................................................................6

I.    THE FTC'S TEST WOULD CHILL SETTLEMENTS IN HATCH-WAXMAN LITIGATION, WHICH ARE CRITICAL TOOLS FOR BRINGING LOWER-COST DRUGS TO THE PUBLIC EARLIER............................................6

    A.    Settlements Facilitate Generic Entry into the Market, Ultimately Resulting in Lower-Cost Pharmaceutical Drugs. ...............7

    B.    The FTC's Proposed Rule Would Chill Patent Settlement in Hatch-Waxman Litigation, to the Detriment of the Public.................10

II.    THE FTC'S PROPOSED RULE CONTRAVENES BOTH *ACTAVIS* AND *TWOMBLY*................................................................13

    A.    The FTC Attempts to Resuscitate the Very "Quick Look" Test that *Actavis* Expressly Rejected. ........................................13

    B.    The FTC Rewrites *Twombly* to Require Facts Giving Rise to a Mere Inference of Liability Rather than a "Plausible" Inference. ......15

    C.    None of the FTC's Justifications for its Proposed Lowered Pleading Standard Passes Muster.......................................20

CONCLUSION ..................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Maricopa, Cty. Med. Soc'y*,
457 U.S. 332 (1982)........................................................................11

*Asahi Glass Co. v. Pentech Pharms., Inc.*,
289 F. Supp. 2d 986 (N.D. Ill. 2003) .............................................12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................16

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................*passim*

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
140 S. Ct. 1009 (2020)....................................................................17

*Delavau, LLC v. J.M. Huber Corp.*,
2017 WL 6525780 (E.D. Pa. 2017) ................................................21

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007) .............................................................18

*Franklin v. Curry*,
738 F.3d 1246 (11th Cir. 2013) ......................................................24

*FTC v. AbbVie Inc.*,
976 F.3d 327 (3d Cir. 2020) ......................................................18, 19

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013)...................................................................*passim*

*Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*,
2009 WL 3672452 (D.N.M. 2009) .................................................21

*House of Materials, Inc. v. Simplicity Pattern Co.*,
298 F.2d 867 (2d Cir. 1962) ...........................................................10

*Kimble v. Marvel Ent'mt, LLC*,
576 U.S. 446 (2015).........................................................................11

*In re Lipitor Antitrust Litig.*,
    868 F.3d 231 (3d Cir. 2017) ...................................................18–19, 23

*In re Loestrin 24 Fe Antitrust Litig.*,
    814 F.3d 538 (1st Cir. 2016)...................................................19

*Mayor & City Counc. of Balt., Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) ...................................................11–12, 17

*Mayor & City Counc. of Balt. v. AbbVie Inc.*,
    42 F.4th 709 (7th Cir. 2022) ...................................................15

*McDermott, Inc. v. AmClyde*,
    511 U.S. 202 (1994)...................................................7

*Ohio Willow Wood Co. v. Thermo-Ply, Inc.*,
    629 F.3d 1374 (Fed. Cir. 2011) ...................................................1, 8

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007) ...................................................16

*PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*,
    615 F.3d 412 (5th Cir. 2010) ...................................................23

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
    917 F.3d 1249 (11th Cir. 2019) ...................................................12

*St. Louis Mining & Milling Co. v. Mont. Mining Co.*,
    171 U.S. 650 (1898)...................................................7

*Texaco, Inc. v. Dagher*,
    547 U.S. 1 (2006)...................................................14–15

*Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*,
    460 U.S. 533 (1983)...................................................18

*Venture Indus. Corp. v. Autoliv ASP, Inc.*,
    457 F.3d 1322 (Fed. Cir. 2006) ...................................................21

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982) ...................................................7

*Williams v. First Nat'l Bank*,
216 U.S. 582 (1910) ................................................................7

*Yamashita v. Scholastic Inc.*,
936 F.3d 98 (2d Cir. 2019) ....................................................22

**Statutes**

35 U.S.C. § 282(a) ....................................................................4

**Other Authorities**

Fed. R. App. P. 29(a) ................................................................3

Anne S. Layne-Farrar, *The Cost of Doubling Up: An Economic
Assessment of Duplication in PTAB Proceedings and Patent
Infringement Litigation*, 10 LANDSLIDE 1 (2018) ................8

*Big Molecule Watch: FDA Approvals*, Goodwin Procter (last updated
July 14, 2023), https://www.bigmoleculewatch.com/fda-approved-
ablas/ ....................................................................................9

Biosimilars Council, *Failure to Launch: Patent Abuse Blocks Access
to Biosimilars for America's Patients* (June 2019),
https://biosimilarscouncil.org/wp-content/uploads/2019/10/Failure-
to-Launch-Part-1.pdf ..........................................................8–9

Bryan Gant, *Understanding* Actavis: *How Courts Misinterpret* FTC v.
Actavis, Inc.*, and How to Get It Right*, 22 HARV. NEGOT. L.
REV. 111 (2016) ..................................................................23

Lauraann Wood, *Jury Hands Endo Win in Opana Pay-For-Delay
Case*, Law360 (July 1, 2022), https://www.law360.com/articles/
1508192/jury-hands-endo-win-in-opana-pay-for-delay-case ..............9

Natasha Singer, *Drug Firms Apply Brands to Generics*, N.Y. Times
(Feb. 15, 2010), https://www.nytimes.com/2010/02/16/business/
16generic.html ......................................................................20

Press Release, *Pfizer and Mylan Team Up to Establish Exclusive Long-Term Strategic Collaboration to Drive Sustained Growth of Generics Business in Japan*, Mylan (Aug. 22, 2012), https://investor.mylan.com/news-releases/news-release-details/pfizer-and-mylan-team-establish-exclusive-long-term-strategic ....................................................................20–21

Press Release, *Qualcomm and Apple Agree to Drop Litigation*, Apple (Apr. 16, 2019), https://www.apple.com/newsroom/2019/04/qualcomm-and-apple-agree-to-drop-all-litigation/ ...........................................21

RBC Capital Mkts., *Pharmaceuticals: Analyzing Litigation Success Rates* 4 (Jan. 15, 2010)......................................................................4, 8

Scott Hemphill, *An Aggregate Approach to Antitrust: Using New Data and Rulemaking to Preserve Drug Competition*, 109 COLUM. L. REV. 629 (2009)........................................................20

Statement of Chester "Chip" Davis, Jr. to the House Energy and Commerce Subcommittee on Health Hearing on "Lowering the Cost of Prescription Drugs: Reducing Barriers to Competition" 5 (Mar. 13, 2019), https://www.congress.gov/116/meeting/house/109107/witnesses/HHRG-116-IF14-Wstate-DavisC-20190313.pdf ..................4

## STATEMENT OF INTEREST[1]

The Association for Accessible Medicines (AAM) is a nonprofit, voluntary association representing manufacturers and distributors of generic and biosimilar medicines and bulk active pharmaceutical chemicals, as well as suppliers of other goods and services to the generic pharmaceutical industry. AAM's members provide patients with access to safe and effective generic and biosimilar medicines at affordable prices. AAM's core mission is to improve the lives of patients by providing timely access to safe, effective, and affordable prescription medicines. Generic drugs constitute 91% of all prescriptions dispensed in the United States, yet generics account for only 18% of total drug spending. AAM regularly participates in litigation as *amicus curiae*.

AAM and its members have a significant interest in the questions presented in this appeal. In the course of developing and bringing to market competitively priced generics and biosimilars, AAM's members must often engage in patent litigation with brand-name manufacturers. These cases "are among the longest, most time-consuming types of civil actions." *Ohio Willow Wood Co. v. Thermo-Ply, Inc.*, 629 F.3d 1374, 1376 (Fed. Cir. 2011) (Moore, J., concurring). They are

---

[1] No party or its counsel authored this brief in whole or part, and no person other than AAM, its members, or its counsel contributed money to fund preparing or submitting this brief. All parties consented to its filing.

also exorbitantly expensive, with the average case costing millions of dollars for each patent in controversy. And the litigation burden has continued to accelerate over the past decade, as brand manufacturers have developed patent estates to deter generic and biosimilar entry, often requiring a manufacturer of generic or biosimilar medicines to overcome numerous patents on a single product in order to come to market.

Given the high costs and uncertainty associated with patent litigation, settlement is a critical tool for advancing generic and biosimilar competition. The Supreme Court's decision in *FTC v. Actavis, Inc.*, 570 U.S. 136, 158 (2013), recognized that a certain type of settlement—one including a "large, unjustified reverse payment" from the brand company to the generic manufacturer—is subject to antitrust review. But the Court also stated that its holding should not "prevent litigating parties from settling their lawsuit," and it squarely rejected the Federal Trade Commission's proposed "quick look" mode of review that would treat these settlements as "presumptively unlawful." *Id.* at 158–59.

The FTC's *amicus* brief in this case is merely the latest in a series of attempts to retract the safeguards in *Actavis*, re-imposing a "quick look" standard of presumptive illegality in all but name. The FTC casts aside any possibility that the contemporaneous business transactions in this case were procompetitive and, instead, lumps them together and insists that they are suspect because some of the

transactions were entered into soon after settlement of the patent litigations. If anything, the FTC's position here is even more radical than the position it pressed in *Actavis*. There, it argued that the settlement be given "a quick look" review. In this case, it suggests that *any* transactions close in time to the settlement "raise serious red flags." Dkt. 170 (FTC Br.) 19.

Adopting the FTC's approach would both contravene *Actavis* and jeopardize the ability of AAM's members to enter procompetitive settlements and contemporaneous business transactions that provide patients with important benefits, such as access to lower-cost generics and biosimilars. Because it has a strong interest in ensuring that *Actavis* is correctly applied, AAM respectfully submits this brief under Federal Rule of Appellate Procedure 29(a).

## INTRODUCTION

Access to affordable and safe medication is critical to the national economy and the health of every American. AAM's membership is committed to ensuring that competitively priced and effective medicines remain available in the market. The numbers prove the importance of this mission: over roughly the past decade, generics have saved customers nearly $1.8 trillion. And FDA-approved biosimilars—highly similar or interchangeable versions of brand-name biologic

medicines—could save customers tens of billions of dollars more in the coming years.[2]

In order to bring lower-cost generic and biosimilar medicines to the public, AAM members must first run the gauntlet of notoriously expensive and lengthy patent litigation. When those multi-million-dollar cases are litigated to judgment, generic manufacturers prevail less than half of the time.[3] The ability of AAM members to enter settlements to resolve those disputes is thus a critical tool for generic and biosimilar entry, allowing AAM members to begin marketing their medicines before patents covering the brand medicine expire—patents that the law treats as presumptively valid. *See* 35 U.S.C. § 282(a).

*Actavis* "recognize[d] the value of settlements and the patent litigation problem," and it "concede[d] that settlement on terms permitting the patent challenger to enter the market before the patent expires … bring[s] about competition, … to the consumer's benefit." 570 U.S. at 153–54. The Court held that a narrow category of patent settlements—those that included a "large,

---

[2] *See* Statement of Chester "Chip" Davis, Jr. to the House Energy and Commerce Subcommittee on Health Hearing on "Lowering the Cost of Prescription Drugs: Reducing Barriers to Competition" 5 (Mar. 13, 2019), https://www.congress.gov/ 116/meeting/house /109107/witnesses/HHRG-116-IF14-Wstate-DavisC-20190313.pdf.

[3] RBC Capital Mkts., *Pharmaceuticals: Analyzing Litigation Success Rates* 4 (Jan. 15, 2010).

unjustified reverse payment"—are subject to antitrust review. *Id.* at 158. But in doing so, the Court cautioned that its holding should not be understood to "prevent litigating parties from settling their lawsuit." *Id.* Significantly, the Court rejected the FTC's proposal to treat "reverse payment settlement agreements [as] presumptively unlawful," holding that challenges to such settlements must proceed under the standard "rule of reason" that governs antitrust review of most agreements, rather than relying on a "quick look" to confirm illegality. *Id.* at 158–59.

Yet, that is essentially the test that the FTC asks the Court to apply here. The FTC urges that, to pass the pleading stage, a complaint must merely allege facts giving rise to a bare inference that transactions occurring soon after settlement are "suspicious" and consistent with unlawful conduct. FTC Br. 2, 13, 20, 22, 24. Such allegations, the FTC argues, are sufficient to shift the burden so that "defendants must justify their reverse payments." *Id.* 20–21. The district court correctly rejected this "quick look" redux, and this Court should too.

Such a test would stifle settlements in Hatch-Waxman litigation, resulting in later generic market entry and, consequently, delayed availability of low-price drugs to the public. Further, the FTC's test contravenes *Actavis*, as it transforms nearly every contemporaneous business transaction into an antitrust violation. The test also flouts *Twombly*, as it replaces the Supreme Court's "plausibility" pleading

standard with a "mere inference" standard. Faithful application of *Twombly*'s pleading standard is always important, but it is especially so for ensuring that *Actavis*'s exception imposing antitrust liability for anticompetitive reverse payments does not swallow the longstanding rule in favor of settlement.

Accordingly, the Court should reject the FTC's test and affirm the district court's dismissal.

## ARGUMENT

### I. THE FTC'S TEST WOULD CHILL SETTLEMENTS IN HATCH-WAXMAN LITIGATION, WHICH ARE CRITICAL TOOLS FOR BRINGING LOWER-COST DRUGS TO THE PUBLIC EARLIER.

Settlements in Hatch-Waxman litigation generally promote competition. Indeed, *Actavis* recognized only a narrow category of settlements that are subject to antitrust scrutiny. And yet the FTC would put a thumb on the scale against any business agreement between a generic and a branded manufacturer that was close in time to any patent settlement between them. Ignoring the real-world context of patent settlements, the FTC instead imagines anticompetitive monsters under every bed. And the FTC would subject settlements and contemporaneous deals to full-blown, expensive litigation—right after the parties settled to avoid further litigation expense.

The immense chilling effect of that possibility would cripple the use of settlements and thwart other business relationships, despite them being critical tools for bringing generic and biosimilar medicines to market.

### A. Settlements Facilitate Generic Entry into the Market, Ultimately Resulting in Lower-Cost Pharmaceutical Drugs.

The Supreme Court has consistently expressed strong support for settlement as a critical tool for resolving disputes. Put simply, "settlements of matters in litigation or in dispute without recourse to litigation are generally favored" and should "be upheld." *St. Louis Mining & Milling Co. v. Mont. Mining Co.*, 171 U.S. 650, 656 (1898); *see also Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims are favored by the courts."); *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994) ("public policy wisely encourages settlements"). This Court similarly has recognized "the general policy favoring the settlement of litigation," as well as the "weighty justifications" for such a policy. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982).

Settlement is especially important in the Hatch-Waxman context because it promotes early entry into the market by generic drug manufacturers, oftentimes resulting in earlier access to low-cost drugs. In recent years, some branded

manufacturers have aggressively sought to develop large patent estates.[4] A patent estate is an accumulation by a branded manufacturer of multiple patents on a drug, sometimes right at the end of the drug's product lifecycle, shortly before the original patents covering the drug would expire. This has the effect of continuing patent coverage on the drug.

This is not to say that every late-issued patent is meritless; indeed, that is part of the problem. To separate out valid patents from invalid ones requires manufacturers of generics and biosimilars to face years of cripplingly expensive litigation to try those patents in court. These lawsuits are infamously long and hard. *Ohio Willow Wood Co.*, 629 F.3d at 1376 (Moore, J., concurring). As Plaintiffs acknowledged, the average cost of patent litigation can be $5–6 million. SA-0012 (citing Compl. ¶ 170). One study estimates the cost of litigation to be $3 million per patent.[5] And, as explained above, generic manufacturers face an uphill battle in such litigation. RBC Capital Mkts., *supra* n.3.

---

[4] *See* Biosimilars Council, *Failure to Launch: Patent Abuse Blocks Access to Biosimilars for America's Patients*, 5 (June 2019), https://biosimilarscouncil.org/wp-content/uploads/2019/10/Failure-to-Launch-Part-1.pdf.

[5] Anne S. Layne-Farrar, *The Cost of Doubling Up: An Economic Assessment of Duplication in PTAB Proceedings and Patent Infringement Litigation*, 10 LANDSLIDE 1 (2018).

Regardless of whether the generics and biosimilars win or lose, these types of patent estates may deter competition by making the price of market entry prohibitive. Costs are imposed on patients and consumers, too. As of July 2023, only 11 of the 30 biosimilars approved by the FDA remain off the market,[6] and AAM's Biosimilars Council found that, as of June 2019, "delayed entry of biosimilars due to patenting has cost the U.S. health care system an astounding $7.6 billion in lost savings since 2015." *Failure to Launch*, *supra* n.4.

Given the escalating complexity and cost of litigating these dense patent estates, it is essential for manufacturers of generic and biosimilar medicines to have the flexibility to bargain effectively for comprehensive deals that guarantee an early launch—providing licenses that cover future patents and agreeing to terms waiving parallel regulatory exclusivities.[7] Even more so, generic and biosimilar manufacturers must be allowed to enter into business relationships after settlements with branded manufacturers to supply materials, purchase intellectual property, or enter joint development projects—as happened here. Each of these

---

[6] *See Big Molecule Watch: FDA Approvals*, Goodwin Procter (last updated July 14, 2023), https://www.bigmoleculewatch.com/fda-approved-ablas/.

[7] Actual experience proves that the failure to negotiate a license covering future patents can delay the entry of lower-cost alternatives and that obtaining such a license is procompetitive. *See, e.g.*, Lauraann Wood, *Jury Hands Endo Win in Opana Pay-For-Delay Case*, Law360 (July 1, 2022), https://www.law360.com/articles/1508192/jury-hands-endo-win-in-opana-pay-for-delay-case.

relationships ultimately could lead to more drug choice for patients with a lower cost, as the district court concluded. *See, e.g.*, SA-0091, SA-0095, SA-0105.

Yet, the FTC would characterize these relationships as unlawful "reverse payments." They are not. They are critical tools for bringing generic and biosimilar medicines to market. And, contrary to the FTC's view (at 29), the timing of such business relationships is not inherently suspicious. It is worth bearing in mind that, prior to the settlement agreement, the branded manufacturer *was suing* the generic manufacturer. That hardly provides conditions for the parties to become business partners. *House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867, 871 (2d Cir. 1962) (a lawsuit "may provide a sound business reason" not to have a business relationship). But, once the litigation is resolved, the branded and generic manufacturers can explore new arrangements.

In short, in the pharmaceutical context, settlements and contemporaneous business transactions must be fostered if generics are to continue to bring low-cost generic drugs to the market, rather than to be forced into litigating endless patents on every drug.

### B. The FTC's Proposed Rule Would Chill Patent Settlements in Hatch-Waxman Litigation, to the Detriment of the Public.

*Actavis* itself recognized "the value of settlements"—particularly those "permitting the patent challenger to enter the market before the patent expires." 570 U.S. at 153, 154. These, the Court reasoned, "would also bring about

competition, again to the consumer's benefit." *Id.* at 154. The Court thus held that courts must consider the size of a reverse payment, its scale in relation to anticipated ligation costs, "its independence from other services for which it might represent payment, and the lack of any other convincing justification." *Id.*

Misapplying *Actavis*, the FTC urges (at 20–21) a rule that presumes contemporaneous business transactions are anticompetitive, shifting the burden so that "defendants must justify their reverse payments." Such a rule would place a massive strain on the industry.

As explained above, Hatch-Waxman and BPCIA litigation is extremely burdensome and expensive for generic manufacturers and, in many cases, delays their entry into the market. Antitrust litigation is, in some ways, worse. It is widely acknowledged that antitrust law imposes "famously burdensome discovery" and "produces notoriously high litigation costs and unpredictable results." *Actavis*, 570 U.S. at 177 (Roberts, J., dissenting); *Kimble v. Marvel Ent'mt, LLC*, 576 U.S. 446, 459 (2015); *see also Arizona v. Maricopa, Cty. Med. Soc'y*, 457 U.S. 332, 343 (1982) ("The elaborate inquiry into the reasonableness of a challenged business practice entails significant costs."). It is thus not something to be taken lightly.

As this Court has noted, "[i]f we permit antitrust plaintiffs to overcome a motion to dismiss simply by alleging" unlawful conduct, "we risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as

easily turn out to have been rational business behavior." *Mayor & City Counc. of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013). Claims lacking sufficient factual support therefore should be weeded out "at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558; *see also Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1267 (11th Cir. 2019) ("A complaint merely alleging several common and obvious industry practices should not proceed directly past a motion to dismiss and into the expensive and settlement-inducing quagmire of antitrust discovery.").

But under the FTC's proposed rule, an allegation that a contemporaneous transaction occurred would, alone, be sufficient to survive a motion to dismiss. As a result, nearly every business transaction subsequent to a patent settlement in the pharmaceutical context could result in antitrust scrutiny and expensive litigation. Faced with the threat of such litigation, many generic and biosimilar manufacturers may choose not to settle and instead wait out the term of a patent before entering the market (if they are unable—or unwilling to pay—to show noninfringement or invalidity of the patent). *See Asahi Glass Co. v. Pentech Pharms., Inc.*, 289 F. Supp. 2d 986, 994 (N.D. Ill. 2003) (Posner, J.) ("If any settlement agreement is thus to be classified as involving a forbidden 'reverse payment,' we shall have no more patent settlements."). The resulting postponement in entry, in turn, delays the

availability of low-cost drugs, exactly contrary to Hatch-Waxman and the BPCIA's goal.

The upshot is that, under the FTC's proposed pleading requirement, generics and biosimilars would find themselves on the horns of a dilemma: choose between lengthy, expensive patent litigation if they do not settle and lengthy, expensive antitrust litigation if they do. Whichever option they choose, they will be saddled with burdensome expenses that are passed down to the public. Either way you slice it, "the consumer loses." *Actavis*, 570 U.S. at 138.

## II. THE FTC'S PROPOSED RULE CONTRAVENES BOTH *ACTAVIS* AND *TWOMBLY*.

Not only would the FTC's proposal make bad policy, it contravenes *Actavis*, as well as the well-settled pleading standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

### A. The FTC Attempts to Resuscitate the Very "Quick Look" Test that *Actavis* Expressly Rejected.

In *Actavis*, the FTC urged the Supreme Court to hold that "reverse payment settlement agreements are presumptively unlawful" and that whether a case should proceed can be resolved after a "quick look" analysis by the court. 570 U.S. at 158–59. That "quick look" analysis would "shift[] to a defendant the burden to show empirical evidence of procompetitive effects." *Id.* at 159 (quoting *California Dental Assn. v. FTC*, 526 U.S. 756, 775 n.12 (1999)). The Court rejected the

FTC's test because patent settlements in this context have "complexities" that do not necessarily cause anticompetitive effects on customers or the market. *Id.*

But the FTC's insistence in this appeal that the burden should shift for defendants to "justify their reverse payments" revives the very "quick look" test that the Court rejected. In fact, the FTC's proposal here is *worse* than a simple repackaging of its prior test. Now, the FTC would apply its "quick look" test to any business transaction that was not "prior to and separate from the settlement" of the patent cases. FTC Br. 19. That is so, the FTC says, because "information necessary to assess potential justifications for a side deal" is "unavailable to plaintiffs before discovery." *Id.* at 15. But that is a recipe to force generics and biosimilars to face meritless antitrust lawsuits.

The FTC also suggests (at 29) that the district court was wrong to analyze the challenged agreements individually, and that it should have imputed any suspicions in any agreement to all six agreements collectively. Even if there were authority for such a proposition—and the FTC cites none—the complaint still fails. There are no allegations of conspiracy among the parties, no allegations that the challenged agreements have any improper relationship to one another, and no allegations identifying how the unspecified collective effect of the agreements is anticompetitive. *See, e.g.*, *Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (explaining that a collection of agreements could violate antitrust laws, but only if the plaintiff

identifies a particular ancillary restraint, such as price fixing, output limitation, or concerted exclusion, that is allegedly causing competitive harm). Absent allegations connecting the six challenged agreements and supporting an anticompetitive conspiracy among the parties, each agreement must be considered on its own merit. Multiple procompetitive agreements do not become anticompetitive merely because the FTC decides to lump them all together. Simply put, "0 + 0 = 0." *Mayor & City Counc. of Balt. v. AbbVie Inc.*, 42 F.4th 709, 715 (7th Cir. 2022) (affirming dismissal of challenge to patent settlements which when "viewed by themselves" were procompetitive, and rejecting the argument that harm to competition can be inferred from the collection of other agreements).

While the FTC maintains a fig leaf (at 14), asserting that a plaintiff must allege that a business transaction amounts to unjustified reverse payment, it is not clear what conclusory allegation could fail the FTC's self-described "modest" test. Ultimately, the FTC continues to ignore the "complexities" of real-world business decisions that led the Supreme Court to reject its test in *Actavis*. This Court should reject the FTC's attempt to resurrect it here.

### B. The FTC Rewrites *Twombly* to Require Facts Giving Rise to a Mere Inference of Liability Rather than a "Plausible" Inference.

In addition to rewriting *Actavis*, the FTC also seeks to revise *Twombly*'s pleading standard. According to the FTC, a plaintiff need only allege facts that give rise to an inference that a contemporaneous transaction is unlawful. FTC Br.

20. But *Twombly* requires more—the alleged facts must give rise to a *plausible* inference of liability. 550 U.S. at 556–57. Facts that are "merely consistent with" liability but are "just as much in line with a wide swath of rational and competitive business strategy" fail to "nudg[e] the[] claims across the line from conceivable to plausible[.]" *Id.* at 554, 570; *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) ("[*Twombly*] held that a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion."); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

*Twombly*'s pleading standard applies to every case, of course, but it is especially important in antitrust cases such as this one. *Twombly* itself was an antitrust case. There, the plaintiffs alleged that large telephone companies conspired to prevent smaller companies from entering their markets by agreeing not to compete with one another. 550 U.S. at 551. In essence, the plaintiffs' complaint asked the Court to infer an unlawful conspiracy based on the mere fact that the defendants engaged in parallel conduct (that is, conduct consistent with an agreement to coordinate their efforts). *Id.* at 550–51. The Court held that this was insufficient, as the plaintiffs' allegations "could just as well" describe lawful "independent action" on the part of the defendants. *Id.* at 557.

In so holding, the Court observed that its articulated pleading standard is especially important for addressing the complexities of the conduct at issue. *Id.* at 554–57. When challenged conduct is nuanced and amenable to multiple interpretations, the mere allegation that a defendant engaged in such conduct effectively amounts to "a naked assertion" of liability, which "stops short of the line between possibility and plausibility." *Id.* at 557.

*Actavis* did not purport to change this pleading standard. And in fact, as explained above, *Actavis* notes that reverse payments involve "complexities" that counsel against a *per se* rule of unlawfulness. 570 U.S. at 159. Thus, taken together, *Actavis* and *Twombly* require a plaintiff to allege facts that give rise to a *plausible* inference that a patent settlement is unjustified and not just that the settlement is merely consistent with an unjustified settlement. When no such facts are alleged, there is no viable antitrust claim, and the complaint must be dismissed. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (there is "no basis for allowing a complaint to survive a motion to dismiss when it fails to allege essential elements of a plaintiff's claim"); *see also Mayor & City Counc. of Balt.*, 709 F.3d 129, 138 (2d Cir. 2013) (dismissing complaint where the conduct alleged to be unlawful "made perfect business sense" in light of economic conditions facing the defendants).

The FTC inappropriately tries to cabin *Twombly*'s holding by limiting it to the case's facts. FTC Br. 25–26. While *Twombly* involved an allegedly *per se* unlawful antitrust conspiracy "stemming from an unwritten agreement," the FTC says, this case involves alleged unlawful side deals stemming from "an express written agreement." *Id.* But *Twombly*'s holding is the law of the land—it is not limited to the particular facts at issue there. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (rejecting "narrow view of *Twombly*" as being limited to certain types of claims). In suggesting otherwise, the FTC confuses *Twombly*'s "factual contours … for its unmistakable holding" to arrive at a "novel interpretation" of that decision. *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 534–35 (1983) (cleaned up). Regardless, the FTC's distinctions miss the point. The conduct at issue in *Twombly* and here *both* involve complexities concerning party motives for the conduct at issue and the conduct's effect on the market. 550 U.S. at 553–54, 557. Such complexities animate *Twombly*'s plausibility standard, which applies with equal force here. SA-0081–82.

Indeed, far from rejecting *Twombly*'s plausibility standard, the FTC's cited cases are entirely *consistent* with that standard. *See, e.g.*, *FTC v. AbbVie Inc.*, 976 F.3d 327, 356 (3d Cir. 2020) (noting that the traditional "law of pleading applies to reverse-payment theories"); *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 251–52 (3d Cir. 2017) ("[T]o survive a motion to dismiss when raising an antitrust violation

under *Actavis*, plaintiffs must allege facts sufficient to support the legal conclusion that the settlement at issue involves a large and unjustified reverse payment under *Actavis*."); *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 552 (1st Cir. 2016) (reading *Actavis* to require plaintiffs to "plead information sufficient" to determine whether a transaction "is 'large' and 'unjustified.'"). In those cases, the plaintiffs "plausibly alleged an anticompetitive reverse payment." *AbbVie*, 976 F.3d at 356. In this one, Plaintiffs have not.

Moreover, the standard applied in the cases cited by the FTC is the very one that the district court applied here. The district court "drew" from both *Twombly* and *Actavis* to conclude that Plaintiffs "must plead facts that would support the claim that the reverse payment was 'large' and 'unjustified,' i.e., that it was not simply *possible* that the defendants engaged in the anticompetitive conduct of paying the generic manufacturer to forego entering the market but that it was *plausible*." SA-0082 (quoting SA-0030) (emphases altered). This standard appropriately respects *Actavis*'s command to subject "large and unjustified" reverse payments to antitrust scrutiny, while at the same time requiring plaintiffs to allege more than facts suggesting that a transaction is merely consistent with unlawful conduct. *Id.* at 16–17.

### C. None of the FTC's Justifications for its Proposed Lowered Pleading Standard Passes Muster.

Even aside from rewriting *Actavis* and *Twombly*, the FTC's arguments fail on their own terms.

The FTC first asserts that, "[o]utside the context of settling patent disputes, brand companies rarely seek the assistance of generic firms with the activities that form the basis of side deals." FTC Br. 7 (cleaned up). Thus, the FTC insists, transactions occurring contemporaneously with reverse payment settlements are inherently suspect because they are so rare. *See, e.g.*, *id.* at 7, 11, 16, 24. But this argument fails both because its premise is wrong and its conclusion is flawed. As an initial matter, the FTC did not itself conduct a study purporting to show that "brand companies rarely seek the assistance of generic firms" and instead relies on a limited survey of only five brand manufacturers in the early 2000s—none of which involved Forest.[8] Further, the FTC ignores the reality that many pharmaceutical companies now (and since before 2012) have both brand and generic businesses.[9] *See* SA-0108.

---

[8] *See* C. Scott Hemphill, *An Aggregate Approach to Antitrust: Using New Data and Rulemaking to Preserve Drug Competition*, 109 COLUM. L. REV. 629, 666 (2009).

[9] *See, e.g.*, Natasha Singer, *Drug Firms Apply Brands to Generics*, N.Y. Times (Feb. 15, 2010), https://www.nytimes.com/2010/02/16/business/16generic.html;

More fundamentally, there is nothing inherently wrong or unusual about arms-length, fair-market transactions that occur contemporaneously with settlements in patent litigation. Indeed, *Actavis* itself noted that exchanges of value reflecting "fair value for services" and goods do not raise the same antitrust concerns as potentially anticompetitive reverse payments. 570 U.S. at 156.

Nor are such transactions so rare that their mere existence would give rise to an inference of wrongdoing. In many non-pharmaceutical cases, for example, patent settlements oftentimes include parallel supply agreements pursuant to which one party agrees to manufacture for the other certain products broadly related to the patent and license at issue.[10] Similarly here, the arrangements among the

---

*see also* Press Release, *Pfizer and Mylan Team Up to Establish Exclusive Long-Term Strategic Collaboration to Drive Sustained Growth of Generics Business in Japan*, Mylan (Aug. 22, 2012), https://investor.mylan.com/news-releases/news-release-details/pfizer-and-mylan-team-establish-exclusive-long-term-strategic.

[10] *See* Press Release, *Qualcomm and Apple Agree to Drop Litigation*, Apple (Apr. 16, 2019), https://www.apple.com/newsroom/2019/04/qualcomm-and-apple-agree-to-drop-all-litigation/ (global settlement of patent litigation included "a multiyear chipset supply agreement," whereby Qualcomm agreed to supply chips to Apple); *see also Venture Indus. Corp. v. Autoliv ASP, Inc.*, 457 F.3d 1322, 1323-24 (Fed. Cir. 2006) (supply agreement for airbag covers stemming from patent settlement); *Delavau, LLC v. J.M. Huber Corp.*, 2017 WL 6525780, at *1 (E.D. Pa. 2017) (supply agreement for calcium carbonate powder arising from patent settlement); *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 2009 WL 3672452, at *1 (D.N.M. 2009) (supply agreement for endodontic products stemming from patent settlement).

parties represent fair-market-value exchanges of money for services, and nothing more. *Actavis* makes clear that such arrangements are not inherently suspect. *Id.*

The mere fact that *some* contemporaneous transactions may be anticompetitive does not allow one to infer that *all* such transactions are. A contrary conclusion would fly in the face of *Actavis*, which rejected the FTC's attempt to substitute presumptions for proof, 570 U.S. at 159, as well as *Twombly*, which requires a pleading to "contain something more" than facts that "merely creates a suspicion [of] a legally cognizable right of action," 550 U.S. at 555; *see also Yamashita v. Scholastic Inc.*, 936 F.3d 98, 105 (2d Cir. 2019) (affirming dismissal of complaint reciting "no more than a collection of speculative claims based on suspicion").

The FTC also suggests that *Actavis*'s "rule of reason" burden-shifting framework alleviates Plaintiffs' pleading obligations under *Twombly*. *See* FTC Br. 14–15. Not so. As its own cited case makes clear, plaintiffs "may proceed to prove their allegations under the traditional antitrust rule-of-reason analysis" only *after* they "allege facts sufficient to support the legal conclusion that the settlement at

issue involves a large and unjustified reverse payment." *Lipitor*, 868 F.3d at 251–52.[11] In arguing otherwise, the FTC puts the cart before the horse.

Of course, a plaintiff need not preempt every possible explanation for the reverse payment to survive a motion to dismiss (assuming it plausibly alleges the existence of a large payment in the first place), as the district court itself recognized. SA-0032. But "a plaintiff must plead at least *some* facts of this nature to sufficiently allege and unjustified agreement." *Id.* (emphasis added). Plaintiffs have not done that here. And, at bottom, "[n]o rule of reason can require defendants to litigate antitrust claims that do not state an antitrust injury beyond motion to dismiss." *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 419 (5th Cir. 2010).

Finally, the FTC insists that a lower pleading standard is appropriate because the relevant facts needed to show that a transaction is unjustified are primarily in a defendant's possession. FTC Br. 15–16. The same was true in *Twombly*, where facts about the defendants' alleged conspiracy—e.g., whether there was "a meeting of the minds"—were not widely available. *See* 550 U.S. at 557. But that did not alleviate the plaintiffs' burden there to allege facts that at least plausibly alleged an

---

[11] *Accord* Bryan Gant, *Understanding* Actavis, 22 HARV. NEGOT. L. REV. 111, 136 (2016) ("Before a defendant can be required to disprove the claim of a reverse payment, a complaint must first plausibly allege that there *is* such a payment.").

antitrust violation. Nor does it here. Moreover, here, Plaintiffs received the challenged agreements from Defendants before filing the operative complaints. *See* Dkt. 182 (Appellees' Br.) 5. And even if *Twombly*'s plausibility standard would mean in some cases, "that a civil plaintiff must do more detective work in advance, the reason is to protect society from the costs of highly unpromising litigation." *Franklin v. Curry*, 738 F.3d 1246, 1252 n.6 (11th Cir. 2013) (quoting *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999)). As discussed above, that salutary goal is especially important in the pharmaceutical and biosimilar context.

In the end, even ignoring the broader policy and legal problems with the FTC's proposal, the justifications that the FTC offers in support of that proposal fail.

## CONCLUSION

The FTC's arguments are out of touch with the real-world context of patent settlements. But *Actavis* makes clear that real-world context matters. The FTC's proposed rule would cripple the use of settlements and thwart other business relationships, despite them being a critical tool for bringing generic and biosimilar medicines to market. The Court should affirm.

Dated: July 24, 2023

/s/ *Richard A. Crudo*
Michael E. Joffre
Kristina Caggiano Kelly
Richard A. Crudo
STERNE KESSLER GOLDSTEIN &
 FOX PLLC
1100 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-2600

*Counsel for* Amicus Curiae*, The
Association for Accessible Medicines*

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B), as modified by Local Rule 32.1(a)(4)(A), in that the brief, according to the word-count feature of Microsoft Word 2016, contains 5,374 words.

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

*/s/ Richard A. Crudo*
Richard A. Crudo

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 24, 2023, I served a copy of the foregoing brief on all parties by filing it on the Court's CM/ECF system where it is available for viewing and downloading.

*/s/ Richard A. Crudo*
Richard A. Crudo
